UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

PATRICIA ANN HARMON, *et al*,     §
                                  §
        Plaintiffs,               §
VS.                               §     CIVIL ACTION NO. 3:12-CV-00153
                                  §
LEGH ANN HARMON, *et al*,         §
                                  §
        Defendants.               §
                                  §

## MEMORANDUM AND ORDER

This case arises from the payment of the late William Harmon's life insurance proceeds to his daughter, Defendant Legh Ann Harmon.  The deceased's widow, Plaintiff Patricia Harmon, claims that Legh Ann and her boyfriend, Defendant Xavier Lee, deceived William into changing the primary beneficiary of the life insurance policy from Patricia to Legh Ann while William was incompetent to make such a decision.  Patricia also claims that Defendant Metropolitan Life Insurance Company, the issuer of the policy, violated various ERISA provisions by distributing the proceeds to Legh Ann without the original paperwork showing the beneficiary change and with knowledge that William was incapacitated when the change was made.  Defendants have moved for summary judgment.  Having reviewed the parties' briefs, the facts, and the applicable case law, the Court **GRANTS** Defendants' motions.

# I.   BACKGROUND

This lawsuit centers around two life insurance policies that William Harmon obtained while employed by Bayer Corporation.  William participated in Bayer's employee benefit program, through which he funded and owned a $125,000 basic life insurance policy and a $125,000 optional supplemental life insurance policy. A beneficiary designation form shows that on April 19, 2000, William designated his wife, Patricia Harmon, as the primary beneficiary of the policies, and his daughter, Legh Ann Harmon, as the secondary beneficiary.  Docket Entry No. 33-11 at 2.

William's health appears to have started deteriorating in 2000 because of "severe pancreatitis with pseudocyst."  Docket Entry No. 48-1 at 7.  William grew physically weak and, in September 2001, began seeing a psychiatrist after suffering from "depression, anxiety, nightmares, and flashbacks."  *Id.*  The Social Security Agency deemed him disabled in August 2002 due to "organic mental disorders and essential hypertension" and he seems to have quit his job around that time.  Docket Entry Nos. 48-3 at 8; 13 at 4.  A March 2003 report from the psychiatrist to a disability claims examiner notes that William's condition had "been generally downhill," showing signs of ongoing deterioration of his cognitive abilities, vascular dementia, and difficulties with short-term memory.  Docket Entry No. 48-1 at 7.

On November 22, 2004, Legh Ann was named the primary beneficiary of the insurance policies, but exactly how that happened is unclear.  The evidence of the beneficiary change is limited and primarily contained in electronic records of Hewitt Associates—the administrative services provider and record keeper for the insurance plan until 2010.   Those records include a computer screenshot documenting that the beneficiary change took place on that date.  Docket Entry No. 38-7 at 71–73.   The records also include a spreadsheet of Health Insurance Portability and Account Act (HIPAA) Notices, which has a November 22, 2004 entry for "Confm PIN Reset"—presumably a notice confirming a change in William's personal identification number—and a November 23, 2004 entry for "HW Bene Confirm"—presumably a notice confirming the change in beneficiary. *Id.* at 74.[1]



Figure 1.  Screenshots showing November 22, 2004 beneficiary change.  Docket Entry No. 38-7 at 73–74.

---

[1] The spreadsheet also has a November 23, 2004 entry for "HW Sal COE AE," but the parties do not explain, and the Court is not aware, of what that means.  Docket Entry No. 38-7 at 74.

In the following years, William's health continued to deteriorate.  After enduring a major stroke in 2008, he died on June 21, 2010 at the age of sixty-three. He was survived by Patricia and Legh Ann, as well as three of Patricia's children from a prior marriage whom he adopted when he married Patricia.

On June 28, 2010, the Bayer Benefits Center sent Legh Ann a letter advising her that she was the designated beneficiary of the insurance proceeds and enclosing a claim form.  Docket Entry No. 40 at 49.  On June 30, 2010, the Bayer Benefits Center faxed its Employer's Statement to MetLife, informing MetLife of William's death, details of his coverage, and that Legh Ann was the designated beneficiary. Docket Entry Nos. 40 at 46–50; 41 at 1–5.  Legh Ann submitted her claim form and the death certificate to MetLife on July 8, 2010.  Docket Entry No. 41 at 16–21.

Patricia alleges that the first time she learned of the beneficiary change was after William's death, when the funeral home advised her that the life insurance policy she provided them to cover the expenses had already been paid to Legh Ann.  Phone logs show that Patricia called MetLife on July 6, 2010 to inquire about the beneficiary change and ask if she could change the named beneficiary, but the representative advised her that such action was not possible.  Docket Entry No. 48-3 at 12.  She called again two days later, stating that her daughter wanted to give up her rights and the proceeds, but the Benefits Center once again refused and

informed her that it had to pay the most current beneficiary listed on file. *Id.* at 13. Though not documented in the phone logs, Patricia alleges that she told the representative that William did not have the mental capacity to change the beneficiary and that the change must have been a mistake. *Compare id.*, *with* Docket Entry No. 48 at 4. She also states that the representative told her the beneficiary change was made online, but that too is not documented in the phone logs. *Id.* The parties also dispute whether, in a subsequent phone call on July 13, 2010, Patricia stated that she would not file a competing claim. Patricia is adamant that she "consistently asserted her claim," Docket Entry No. 48 at 5, but the phone record states: "Isn't going to file a clm. . . . let Exmnr know not going to file clm, can proceed." Docket Entry No. 48-3 at 15. MetLife paid the insurance proceeds to Legh Ann on July 15, 2010. Docket Entry No. 43 at 37.

Shortly thereafter, Patricia retained counsel in connection with her alleged interest in the life insurance proceeds. On July 23, 2010, her counsel wrote MetLife asserting claims on three bases: (1) the change of beneficiary was the result of Legh Ann's undue influence; (2) the decedent lacked the mental capacity to understand the effect of his conduct at the time of the beneficiary change; and (3) the life insurance premiums were paid with community property entitling Patricia to a 50% interest. Docket Entry No. 48-4 at 1. MetLife responded on August 12, 2010, denying the claim. *Id.* at 4. It reasoned that Patricia had advised

on July 13 that she would not be filing a claim, and therefore it processed payment in good faith pursuant to the most recent beneficiary designation on file. *Id.* MetLife also informed Patricia's counsel that, under ERISA, he had sixty days to file a written appeal, which should include "the reason(s) you believe the claim was improperly denied, and [] any additional comments, documents, records or other [information]." *Id.* at 4–5.

Patricia hired new counsel who filed a formal appeal with MetLife on October 15, 2010. Docket Entry No. 42 at 8–9. The appeal letter argued that the payment was based on "insufficient and erroneous documentation provided by Bayer" and complained that no evidence was provided to Patricia regarding the beneficiary change. *Id.* at 8. It also urged that Patricia had "a good faith belief that there was an error made in the payment of the [] claim" and "a good faith belief that the designated beneficiary was changed by means of fraud," but attached no evidence in support of those beliefs. *Id.* at 9. After receiving the appeal, MetLife's claim examiner referred the appeal to a "senior" who reviewed the entire file and advised that "[n]othing was provided that would prove that we paid the wrong Bene based on fraud" and thus that Metlife should uphold the paid-in-good-faith letter. *Id.* at 12. The examiner also requested that the Plan's third-party administrator provide the actual beneficiary designation on file for William Harmon. *Id.* at 13–14. Affiliated Computer Services—the company that replaced

Hewitt as the third-party administrator in 2010—responded that it did not have any original beneficiary designation paperwork and that the only beneficiary designation information that it received from Hewitt was in the form of computer screenshots.  *Id.* at 17–18.  Nonetheless, "based on the record before" it, MetLife determined that the appeal was without merit and upheld the denial of the claim. *Id.* at 21–22.

Unsatisfied with MetLife's determination, Patricia filed suit in state court on April 20, 2012, naming both herself and the decedent's estate as plaintiffs. Defendants removed the action to this Court on May 21, 2012.  In her latest pleading, Patricia names six Defendants: Legh Ann, Xavier Lee, MetLife, Hewitt, Affiliated Computer Services, and Bayer Corporate & Business Services, LLC. Docket Entry No. 13 ¶¶ 3–8.

Patricia alleges that Legh Ann and Lee moved in with her in August 2009 with the pretext of caring for William, but with actual intentions of stealing her money before fleeing to Maryland.  *Id.* ¶ 16.  She also alleges that Legh Ann either accessed William's life insurance policy information on MetLife's website and secretly changed the beneficiary designation or that Legh Ann unduly influenced William into changing the beneficiary designation.  *Id.* ¶¶ 16–19.  Based primarily on these allegations, Patricia brings causes of action against Legh Ann and Lee for fraud and misrepresentation; undue influence for the purpose of conversion; unjust

enrichment and restitution; violation of the Texas Theft Liability Act; intentional infliction of emotional distress; and constructive trust.

With respect to the corporate Defendants, Patricia brings causes of actions under ERISA section 502(a)(1)(B) to recover benefits alleged due to her under the terms of the plan, and under ERISA sections 502(a)(2), 404(a), and 409 for breach of fiduciary duty.  Patricia has dismissed her claims against Hewitt and Affiliated Computer Services, *see* Docket Entry Nos. 31; 50, and it appears that Bayer was never served.  However, Patricia still asserts her claims against MetLife.  She alleges that MetLife's decision to pay Legh Ann was arbitrary and capricious because it was made with knowledge that: (1) she was asserting a rival claim; (2) William had mental illnesses when the beneficiary change was made; and (3) no written beneficiary change was on file despite the fact that beneficiary changes had to be in writing.

The remaining Defendants now seek summary judgment.  Legh Ann and Lee argue that Patricia has no evidence to support the claims against them. MetLife argues that it is absolved of liability because its decision to pay Legh Ann was reasonable and made in good faith; that the claims under ERISA sections

502(a)(2), 404, and 409 fail as a matter of law; and that the estate does not have the capacity to sue.  For the reasons below, the Court grants Defendants' motions.[2]

## II.   STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III.   DISCUSSION

### A.   The Claims Against Legh Ann Harmon and Xavier Lee

Though Patricia's amended complaint broadly accuses Legh Ann and Lee of secretly changing the beneficiary designation by means of fraud and deception, it provides very little insight into how they may have done so or for what acts or

---

[2] Both MetLife and the individual Defendants argue that the Estate's claims should be barred because a decedent's estate is not a proper legal entity that can sue or be sued.  *See* Docket Entry Nos. 39 at 22 (citing *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005)); 57 at 26 (citing *Price v. Estate of Anderson*, 522 S.W.2d 690, 691 (Tex. 1975)).  Though Plaintiffs concede this argument in their responses to both motions for summary judgment, the Court need not address the issue, as the merits of both Plaintiffs' claims are the same and fail for the reasons discussed below.

omissions they are liable.  Rather, Patricia relies on the following circumstantial evidence to establish wrongdoing:

1. William had mental health issues in 2004;

2. the beneficiary change was allegedly done by computer, and William did not own a computer or know how to use one; and

3. Legh Ann had a financial motive to be named beneficiary.

From these benign facts, Plaintiffs want the jury to conclude that Legh Ann and Lee either coerced or tricked William into changing the beneficiary or obtained his computer password and made the change themselves.  While, as a general matter, circumstantial evidence may be used to establish the type of wrongful conduct that is at the heart of Patricia's claims, the Court determines that this circumstantial evidence is insufficient to enable a reasonable juror to return a verdict finding that Legh Ann or Lee engaged in wrongdoing.

Patricia suggests that William's mental health issues made him susceptible to deception or coercion by Legh Ann and Lee.  However, Patricia presents no evidence that Legh Ann and Lee were communicating with William in 2004, much less that they were in a position to deceive or coerce him into changing his beneficiary status at that time.  Patricia alleges that Legh Ann and Lee "were fully aware that William B. Harmon was not competent and lacked mental capacity because that was their announced reason for moving in with" him in August 2009,

but she does not explain how such awareness of William's mental capacity in 2009 relates to the beneficiary change in 2004. Docket Entry No. 13 ¶ 17.

With respect to the computer, even assuming that the beneficiary change occurred online, the circumstantial evidence regarding the use of a computer fails to create a fact issue that Legh Ann and Lee engaged in wrongdoing.[3] Patricia provides her own affidavit testimony stating the William did not own or know how to operate a computer, but even if William did not know how to use a computer, there is no credible evidence that Legh Ann or Lee made the change or that they had access to William's password. Patricia states that she "believes that Legh Ann Harmon was able to access William B. Harmon's life insurance policy information at Met Life's website and secretly make the change of beneficiary designation," Docket Entry No. 13 ¶ 19, but she cites no admissible evidence supporting such accusations in her summary judgment response.[4] *See* Docket Entry No. 59.

---

[3] While the evidence is inconclusive whether the beneficiary change occurred online, by letter, by fax, or by phone, the Court will assume that it occurred online because MetLife and the third-party administrators could not find paperwork for the beneficiary change and reasonable doubts on factual disputes are to be resolved in favor of the nonmoving party. *See Evans*, 246 F.3d at 348 (citation omitted).

[4] Though not attached to her summary judgment response, Patricia states in her deposition that during one of her phone conversations with MetLife after William's death, the representative told her that Legh Ann changed the designation on the computer. *See* Docket Entry No. 57-13 at 1. But such a statement is inadmissible hearsay when used against Legh Ann or Lee. It is not in MetLife's phone logs and Patricia is unable to identify the representative. Indeed, in her deposition, Patricia ultimately admitted that she does not know whether Legh Ann and Lee did anything to change the beneficiary status. *See* Docket Entry Nos. 48-3 at 12–16; 57-13 at 1, 18; 55 at 7–9.

Accordingly, given that Patricia cannot create a fact issue to show that Legh

Ann and Lee engaged in wrongful conduct, and her claims are all contingent on

such conduct, summary judgment is warranted.    Moreover, the following

examination of each of the alleged causes of action highlights additional legal

deficiencies, which make it impossible for a reasonable jury to return a verdict for

Patricia.  *See Anderson*, 477 U.S. at 248.

### 1.  Fraud and Misrepresentation

The first cause of action Patricia asserts is "fraud and misrepresentation."

Docket Entry No. 13 at 9.  A plaintiff seeking to prevail on a fraud claim in Texas

must prove that:

> (1) the defendant made a material misrepresentation; (2) the defendant
> knew the representation was false or made the representation
> recklessly without any knowledge of its truth; (3) the defendant made
> the representation with the intent that the other party would act on that
> representation or intended to induce the party's reliance on the
> representation; and (4) the plaintiff suffered an injury by actively and
> justifiably relying on that representation.

*Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011)

(citations omitted).

The claim fails for a number of reasons.  Patricia provides no evidence that

Legh Ann and Lee made any representations that were relied on, much less that

they made any false representations.  The representations underlying the claim are still unclear.[5]

And there is certainly no evidence that Patricia "suffered an injury by actively and justifiably relying on that representation."  *Exxon*, 348 S.W.3d at 217 (citations omitted).  While Patricia raises vague allegations about Legh Ann and Lee fraudulently inducing William into changing his beneficiary designation and fraudulently inducing MetLife into changing the designation without proper permission, she never alleges that she relied on any representation as required for a fraud claim.  To the extent Legh Ann misrepresented her claim to the insurance proceeds, Plaintiffs did not rely on such statements and conduct, but challenged them with MetLife and now in court.  Plaintiffs' fraud claim fails as a matter of law.

### 2. Undue Influence

Plaintiffs label their second cause of action as "undue influence for the purpose of conversion," Docket Entry No. 13 at 9, which, to the Court's

---

[5] In the complaint, Patricia alleges that misrepresentations were directed toward William without specifying what those were.  *See* Docket Entry No. 13 at 9 ("Plaintiffs will show that Legh Ann Harmon and Xavier Lee made material and false representations and omissions of material facts to Plaintiffs in coercing William B. Harmon to change the beneficiary designation" and that "William B. Harmon did act and rely on the fraudulent and false statements.").  However, in her summary judgment response, Patricia asserts that the misrepresentation was the filing of a life insurance claim after William's death: "The act of making a claim for the life insurance benefits of William B. Harmon by Legh Ann Harmon with her knowledge . . . of his mental disability is an act of fraud because she and Xavier Lee knew or they should have known that Legh Ann Harmon did not have the right to claim the life insurance proceeds . . . ."  Docket Entry No. 59 at 13–14.

knowledge, is simply an undue influence claim.   "Undue influence in the procurement of a testament is a ground for its avoidance separate and distinct from the ground of testamentary incapacity; for while testamentary incapacity implies the want of intelligent mental power, undue influence implies the existence of a testamentary capacity subjected to and controlled by a [dominant] influence or power."   *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963) (citations omitted).   "To show undue influence, a plaintiff must prove: '(1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence.'"   *Wackman v. Rubsamen*, 602 F.3d 391, 412–13 (5th Cir. 2010) (quoting *Rothermel*, 369 S.W.2d at 922).   The cause of action can also apply in the context of a life insurance policy dispute.   *See McDaniel v. Householder*, No. 11-09-00307-CV, 2011 WL 3793326, at *3 (Tex. App.—Eastland Aug. 25, 2011, no pet.) (citing *In re Estate of Woods*, 542 S.W.2d 845, 847 (Tex. 1976) and *Rothermel*, 369 S.W.2d at 922) (setting out the same elements of an undue influence cause of action).

The party seeking to set aside the instrument bears the burden of proving undue influence.   *Rothermel*, 369 S.W.2d at 922.   "The evidence must show more than mere opportunity to exercise influence."   *Wackman*, 602 F.3d at 413 (citing

*Dulak v. Dulak*, 513 S.W.2d 205, 209 (Tex. 1974)).   A plaintiff may use circumstantial evidence to prove the claim, but still must "introduce some tangible and satisfactory proof." *Rothermel*, 369 S.W.2d at 922 (citation omitted).  And the influence must not merely be present, but unduly exerted such that "the free agency of the testator was destroyed." *Id*.  Such influence often takes the form of "force, intimidation, duress, excess importunity or deception" and "usually involves an extended course of dealings and circumstances." *Id.*

Patricia is unable to raise a genuine issue of fact that Legh Ann or Lee exerted any influence over William and thus her undue influence claim is subject to summary judgment.   Patricia presents no evidence to demonstrate that Defendants were in a position to exercise dominion over William in November 2004, when the beneficiary designation was changed, much less that they actually did so.

The Court is not persuaded by any of Patricia's alleged bases for the claim. Patricia attempts to prove her claim by arguing that William was mentally disabled since 2001, but, even if such allegations were true, undue influence requires exertion of influence rather than mere incapacity.  *See Rothermel*, 369 S.W.2d at 922.  Patricia does not present such evidence of influence, or even evidence that in 2004, Legh Ann communicated with William or knew of his purported incapacity. *See Paige-Hull v. Wofford*, No. 3:05-CV-1339-BH, 2008 WL 4274504, at *7 (N.D.

Tex. Sept. 17, 2008) ("When circumstantial evidence is relied upon, the circumstances must be so strong and convincing and of such probative force as to lead a well-guarded mind to a reasonable conclusion not only that undue influence was exercised but also that it controlled the willpower of the testator at the precise time the will was executed." (citing *Estate of Davis v. Cook*, 9 S.W.3d 288, 293 (Tex. App.—San Antonio 1999, no pet.)).  Even if Patricia asserted her claim based on lack of mental capacity rather than undue influence, the evidence from Dr. Wamble—while showing that William suffered from disabilities and mental illness in 2004—fails to show that William lacked "sufficient mind and memory to understand the nature and effect of his act."  *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.).

In sum, Patricia presented no direct evidence of undue influence and her circumstantial evidence is weak and not probative.  The undue influence claim fails as a matter of law.

### 3.  *Unjust Enrichment*

Plaintiffs next assert a cause of action for "unjust enrichment and restitution," based on Legh Ann's "receipt of approximately $250,000.00 in ill gotten life insurance proceeds as a direct and proximate result of her fraudulent representations to Plaintiff."  Docket Entry No. 13 at 10.  "A party may recover under the unjust enrichment theory when one person has obtained a benefit from

another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (citations omitted).

For the reasons already discussed, Patricia has not offered evidence to raise a genuine issue whether Legh Ann received the life insurance proceeds by fraud or other undue means.  Rather, Legh Ann received the life insurance money as the last designated beneficiary on file.  *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ("When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." (citation omitted)).   As such, Defendants are entitled to summary judgment on the unjust enrichment claim.

### 4.  *Texas Theft Liability Act*

The fourth cause of action pled in Plaintiffs' complaint is violation of the Texas Theft Liability Act, which imposes liability on a "person who commits theft."  Tex. Civ. Prac. & Rem. Code Ann. § 134.003(a).  It defines "theft" as "unlawfully appropriating property or unlawfully obtaining services as described by" certain provisions of the Penal Code.  *Id.* § 134.002(2).  The penal provision implicated here is section 31.03, which prohibits appropriation of property "without the owner's effective consent."  Tex. Penal Code Ann. § 31.03(b)(1).

Once again, Plaintiffs fail to present sufficient evidence to show that Legh Ann or Lee unlawfully appropriated the life insurance proceeds.  Contrary to

Plaintiffs' claims, Patricia was not listed as the last-named beneficiary on file, and thus the proceeds were not her property. Plaintiffs' claim under the Texas Theft Liability Act is subject to summary judgment.

### 5. Intentional Infliction of Emotional Distress

Next, Plaintiffs claim that some nebulous conduct on the part of Legh Ann and Lee was "aimed at illicitly obtaining all of the insurance proceeds" and done for the purpose of depriving Patricia of money and causing her to suffer severe and intense emotional distress. Docket Entry No. 13 at 11. To succeed on this claim, a plaintiff must establish that: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004) (citation omitted).

As an initial matter, it is not clear if Plaintiffs are pursuing this claim because they did not respond to Defendants' summary judgment arguments. In any event, given that Patricia cannot even identify the conduct at issue, she clearly cannot establish "extreme and outrageous" conduct. *Id.* (defining such conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" (citations

and internal quotation marks omitted)).    Plaintiffs' intentional infliction of emotional distress claim is subject to summary judgment.

> ### 6. *Constructive Trust*

Finally, Plaintiffs asks that the Court impose a constructive trust on the $250,000 of life insurance proceeds.  "A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment."  *Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth 2004, pet. denied) (citation omitted).  To obtain a constructive trust, a proponent must prove: "(1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res."  *Id.* (citation omitted).  Whether to impose a constructive trust at all is within the discretion of the trial court.  *Id.* (citation omitted).

For the reasons described above, Plaintiffs fail to raise a fact issue on whether Defendants breached any duty or committed actual fraud.  Accordingly, the request for a constructive trust is subject to summary judgment.

> ## B.    The Claims Against MetLife

Plaintiffs bring two categories of ERISA claims against MetLife.  They allege that MetLife breached its fiduciary duties under ERISA sections 404(a), 409, and 502(a)(2) and that Plaintiffs are entitled to recover plan benefits under section 502(a)(1)(B).

### 1. Fiduciary Duty Claims

Plaintiffs allege that MetLife breached its fiduciary duty "by failing to act solely in the interest of participants, in failing to act in accordance with the life insurance policy terms and in preferring their own financial interest over that of the participant."   Docket Entry No. 13 at 14.   Plaintiffs no longer appear to be advancing these claims, as they conceded in their summary judgment response all of MetLife's arguments as to why the claims fail as a matter of law.   Accordingly, the Court will only briefly address the reason each fiduciary duty claim is subject to summary judgment.

The ERISA provisions on which Plaintiffs' fiduciary duty claims are based only provide causes of action for breaches of duty to the plan as a whole, as opposed to an individual policy or beneficiary.   Section 502(a)(2) of ERISA authorizes certain parties to bring actions to recover for violations of the fiduciary obligations defined in section 409(a).   *See* 29 U.S.C. § 1132(a)(2);[6] *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 253 (2008).   Under well-established Supreme Court precedent, section "502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries."   *LaRue*, 552 U.S. at 256; *see also Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985) ("A fair contextual reading of the statute makes it abundantly clear that its draftsmen were

---

[6] While section 409 establishes the liability for a breach of fiduciary duties, section 404 sets out the fiduciary duties.  *See* 29 U.S.C. § 1104.

primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.").

Because Plaintiffs are seeking to recover based on their individual injuries, rather than injuries to the entire plan resulting from mismanagement of plan assets, their fiduciary duty claims fail as a matter of law.

### 2. ERISA Section 502(a)(1)(B) Claim

Plaintiffs' proper statutory avenue for challenging the beneficiary determination is section 502(a)(1)(B), which allows a plan participant or beneficiary to file suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In cases such as this one in which the plan grants the plan administrator discretionary authority to interpret the terms of the plan and to render benefit decisions, *see* Docket Entry No. 40 at 43, courts review the administrator's decisions for abuse of discretion. *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (citing *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 257–58 (5th Cir. 2009)). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Id.* (citations and internal quotation marks omitted). "Under the abuse of discretion

standard, if the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 397–98 (5th Cir. 2007) (citations and internal punctuation omitted).   "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004) (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)).   A court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999) (en banc), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

Moreover, "when assessing factual questions, the district court is constrained to the evidence before the plan administrator." *Id.* at 299 (collecting cases). "[E]vidence may not be admitted in the district court that is not in the administrative record when that evidence is offered to allow the district court to resolve a disputed issue of material fact regarding the claim . . . ." *Id.* at 289. "[T]he administrative record consists of relevant information made available to the

administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Id.* at 300.

MetLife did not abuse its discretion when it issued the insurance benefits to Legh Ann and later when it denied Patricia's appeal, because its decisions were based on substantial evidence—namely, Hewitt's electronic records showing the beneficiary designation change on November 22, 2004.[7]   Plaintiffs object to MetLife's decision to pay the insurance benefits to Legh Ann on three grounds: (1) "Met Life knew Patricia [] was asserting a rival claim"; (2) "Met Life knew that William [] suffered from a mental disability that would render him incapable of changing the designated beneficiary"; and (3) "Met Life knew the date on the written beneficiary designation naming Legh Ann [] the beneficiary under William['s] life insurance policies could not be ascertained by Met Life causing the written beneficiary designation of Legh Ann [] to be defective and non compliant with the Summary Plan Description and the terms of the Met Life insurance policies."   Docket Entry No. 48 at 9.   The Court finds these objections unconvincing.

---

[7] The Court's finding is also bolstered by the fact that MetLife had no conflict of interest in rendering is decision. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) ("[A] conflict should be weighed as a factor in determining whether there is an abuse of discretion." (citation and internal quotation marks omitted)).   Unlike some life insurance cases in which an administrator is determining whether or not to issue a payment that would come out of its own pockets, MetLife was merely deciding whether to issue a $250,000 payment to Legh Ann or Patricia.

First, whether MetLife knew that Patricia was asserting a rival claim when it paid Legh Ann is insignificant.  The question in reviewing even a disputed claim is whether Metlife's decision was an abuse of discretion.  And, in any event, Patricia still had the opportunity to appeal the decision, which she did, though unsuccessfully.

Plaintiffs' second argument, regarding MetLife's knowledge of William's incapacity, is also unavailing.  According to Plaintiffs, MetLife knew that William was disabled because William's "employee records would contain extensive records regarding [his] disability including information that he was receiving social security disability payments."  Docket Entry No. 48 at 10–11.  There is a big difference between having a disability and being incapacitated.  Plaintiffs fail to identify any information that MetLife possessed showing that William was incapacitated in 2004.  Such evidence must have been in the administrative record and not merely in Plaintiffs' summary judgment submissions, such as Dr. Wamble's affidavit.  *See Vega*, 188 F.3d at 299.  When Patricia filed her appeal with MetLife, she did not attach any medical records or other information suggesting that William was mentally incapacitated in November 2004, even though MetLife's right-to-appeal letter advised her to include any additional documents or records.  Docket Entry No. 42 at 6–9.  Therefore, even if MetLife possessed documents regarding William's disability in its employee records—such

as the Social Security Administration notice that William was found disabled in August 2002 with "organic mental disorders," Docket Entry No. 48-3 at 8— MetLife did not abuse its discretion by failing to conclude from that information that on November 22, 2004, William lacked "sufficient mind and memory to understand the nature and effect of his act." *Decker*, 192 S.W.3d at 652.[8]

Plaintiffs' third objection concerns whether MetLife abused its discretion by paying Legh Ann even though it did not have written documentation designating her as the beneficiary. Plaintiffs' argument is premised on the notion that the plan requires beneficiary changes to be in writing and that the beneficiary change was invalid because it was purportedly made online. As discussed above, it is not clear the change was made online, and unlike this Court's standard for viewing the evidence, MetLife need not resolve that dispute in Plaintiffs' favor. Moreover, the record is not clear whether the plan actually prohibited online or telephonic beneficiary changes. For instance, the insurance certificate allows a participant to change his beneficiary designation by "send[ing] a Signed and dated, Written request to the Policyholder using a form satisfactory to Us"; however, it defines "Written" as "a record which is on or transmitted by paper or electronic media

---

[8] Patricia notes two other ways in which MetLife should have been aware of William's incapacity. First, she states that she advised them of the disability; however, she never alleges that she provided MetLife with any evidence of the disability. Second, she states that Bayer advised MetLife that William had been on disability when MetLife was preparing payment of the life insurance proceeds, but the correspondence to which she refers makes no mention of mental incapacity. *See* Entry No. 48-4 at 13.

which is acceptable to Us and consistent with applicable law."  Docket Entry No.

40 at 32, 35.   And other insurance plan documents, such as the Online Bayer

Benefits Manual, allow a participant to "change [his] beneficiary at any time on

this site or by calling the Bayer Benefits Center and [the] choices will take effect

immediately."   Docket Entry No. 38-7 at 76; *see also id.* at 79 (allowing online

beneficiary changes).   In the end, MetLife chose to follow the most recent records

it had from the third-party administrator, which showed that Legh Ann was the last

named beneficiary.  Those records were merely computer screenshots and may not

have been as reliable as certain other forms, but they nonetheless provided

substantial evidence from which MetLife could make a decision.  The law does not

require that MetLife base its decision by a preponderance of the evidence, but

merely by more than a scintilla.  *Ellis*, 394 F.3d at 273 (citation omitted).[9]

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants Legh Ann

Harmon and Xavier Lee's Motion for Summary Judgment (Docket Entry No. 57)

---

[9] Plaintiffs mention two other reasons why MetLife's decision was arbitrary and capricious. They point out that the Hewitt screenshot listing Legh Ann as the beneficiary has a "2" next to her name, meaning that she was the secondary beneficiary.  *See* Figure 1, *supra*.  But the "2" is merely a relationship code for child.  *See* Docket Entry no. 38-7 at 67.  Plaintiffs also try to draw suspicion from the fact that Legh Ann called Bayer or MetLife on July 8, 2010 to verify when she was listed as the beneficiary and that MetLife responded that it was unable to read the date on the document.  *See* Docket Entry No. 48-3 at 11.  The Court does not find this evidence to be probative of any wrongdoing or conspiracy.

and **GRANTS** Defendant Metropolitan Life Insurance Company's Motion for Summary Judgment (Docket Entry No. 39).

      **IT IS SO ORDERED.**

      **SIGNED** this 2nd day of August, 2013.

_____
                    Gregg Costa
             United States District Judge